## IN THE COURT OF APPEALS OF IOWA

No. 3-1084 / 12-0729
Filed February 5, 2014

STATE OF IOWA,
        Plaintiff-Appellee,

vs.

PATRICK MICHAEL DUDLEY,
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Marion County, Darrell J. Goodhue,

Judge.


        Patrick Dudley appeals his judgment and sentence for two counts of

second-degree sexual abuse. **REVERSED AND REMANDED.**


        Kent A. Simmons, Davenport, for appellant.

        Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney

General, Ed Bull, County Attorney, and Nicole Olson, Assistant County Attorney,

for appellee.


        Heard by Danilson, C.J., and Vaitheswaran and Mullins, JJ.  Goodhue,

S.J., takes no part.

**VAITHESWARAN, J.**

Patrick Dudley appeals his judgment and sentence for two counts of second-degree sexual abuse. He raises several arguments in support of reversal, one of which we find dispositive: whether the district court abused its discretion in admitting a psychologist's opinion that a child's physical manifestations and symptoms "were consistent with a child dealing with sexual abuse trauma."

## I.     *Background Facts and Proceedings*

Patrick Dudley and his wife took their nine-year-old granddaughter to visit a friend. After returning from the trip, the child told her mother that Dudley molested her.

The State charged Dudley with two counts of second-degree sexual abuse. Dudley moved to enforce a claimed agreement with the prosecutor to dismiss the charges if he passed a polygraph test before the prosecutor spoke to the complaining witness. Following a hearing at which Dudley's attorney testified, the district court denied the motion. The court concluded the prosecutor's offer was withdrawn before Dudley took the polygraph test.

Prior to trial, Dudley filed a motion in limine challenging proposed testimony from the complaining witness's psychologist, Mary Casey. Dudley argued that Casey would impermissibly vouch for the child's credibility. The district court denied the motion.

At trial, the State called several witnesses, including the child, the child's mother, the psychologist, and a neighbor to whom the child narrated the incident. Before the psychologist testified, the child's mother painted a "before and after"

picture of the child, stating she changed from a "girly girl" to "more of a tomboy." She recounted that the child turned white when she saw the cars her grandfather drove.

Dudley testified and denied the allegations. Following trial, the jury found Dudley guilty as charged. Dudley appealed.

## II. Agreement to Dismiss Charges

Dudley contends the district court should have granted his motion to enforce an "executory" agreement to dismiss the charges. As noted, the State's offer to dismiss the charges was predicated on Dudley's completion of a polygraph test before the prosecutor spoke to the complaining witness. Dudley did not complete the test within that time frame. Because the offer was off the table when he took the test, the district court did not abuse its discretion in denying the defense motion.

## III. Admission of Expert Testimony

At trial, Casey testified that she began treating the child based on "concerns over her well-being due to child sexual abuse." The treatment spanned thirteen sessions and resulted in diagnoses of posttraumatic stress disorder and generalized anxiety disorder. Casey defined posttraumatic stress syndrome as "a disorder that happens because of a traumatic event," is initially characterized by "intrusive thoughts centered around the traumatic event," and is followed by "a sense of avoidance and numbing." She went on to state that the physical manifestations of posttraumatic stress disorder would be "different in degree" depending on the nature of the trauma. When asked about "the telltale triggers for child or adolescent sexual abuse," she stated, "The number one

would be if they actually saw the perpetrator or if they anticipate that a certain event or somewhere where they might be in the general public where they anticipate that they may see that person, if there's something that they may identify with the person such as the person's car." She continued, "[T]he one thing we have to remember is it depends on the relationship that that person has with the perpetrator and how well they know that person, and then those triggers . . . can vary or be more severe." Casey agreed with the prosecutor that sexual abuse victims in the child or adolescent range "frequently change their dress or appearance," going to the extremes of either layering their clothes or becoming "quite provocative." She also opined that numbing, characterized by constriction of the individual's facial muscles, was "consistent with child or adolescent sexual abuse "if the child is experiencing posttraumatic stress disorder."

At this juncture, Casey was asked, "Did you observe changes in [the child's] physical manifestation or the way she was presenting herself while you worked with her?" Over defense counsel's objection, Casey responded, "Definitely constricted affect, kind of a slower—you know, when I first met her, she was very constricted and slow in her response. She was layered. She had lots of little layers, you know, a couple tanks and, you know, sweater, and she typically, you know, didn't do that. Her clothing changed several times actually."

Casey also testified that she had seen changes in hairstyles among adolescents or children who experienced posttraumatic stress syndrome as it related to sexual abuse. She agreed that this was "consistent with the concept" of changes in personal behavior. When asked if she observed the child "have

changes in hairstyling or length," she responded, "Well, I haven't thought of this but she did. She cut her hair. She had her hair cut. She wanted her hair cut."

Next, Casey was asked whether anniversaries were important triggers. She responded, "Yeah, it's a trigger." She was then asked, "[D]id [the child] demonstrate any trauma or trigger around [the anniversary date of the incident]?" She responded, "[H]er clothing was very different. We didn't talk about the date or anniversary, but she was dressed very boyish. She was in . . . clothes that I've never seen her before . . . baggy clothes, baggy sweatshirt." She agreed with the prosecutor that this was very "relevant and noteworthy."

Finally, the prosecutor asked the following question: "[D]o you have an opinion based on your line of work again, based on your credentials as to whether or not her symptoms were consistent with a child dealing with sexual abuse trauma?" Casey responded, "Yes, her symptoms were."

On cross-examination, defense counsel sought to clarify Casey's opinion. He asked whether her testimony was that "[t]he [child's] symptoms were consistent with sexual abuse." She responded, "Yeah."

Dudley contends the district should not have admitted Casey's opinion testimony because its "obvious purpose" was to "bolster the credibility of the complaining witness." The State responds that Casey's testimony was admissible because she did not "testif[y] that [the child] had been sexually abused, [the child] was telling the truth, or that Dudley had sexually abused her." In superb oral arguments, both sides explored the precedent on either side of the issue.

Counsel began with *State v. Myers*, 382 N.W.2d 91, 91 (Iowa 1986), an appeal of a conviction and sentence for indecent contact with a child. There, a school principal and a child abuse investigator testified that children rarely lied to them about sexual abuse. *Myers*, 382 N.W.2d at 91. In considering the propriety of this testimony, the court stated "expert opinions on the truthfulness of a witness should generally be excluded because weighing the truthfulness of a witness is a matter reserved exclusively to the fact finder." *Id.* at 95. The court acknowledged that "experts will be allowed to express opinions on matters that explain relevant mental and psychological symptoms present in sexually abused children." *Id.* at 97. The court cautioned, however, that "[t]here is a fine but essential line between testimony that is helpful to the jury and an opinion that merely conveys a conclusion concerning the defendant's guilt." *Id.* (internal quotation marks omitted). The court explained that, in the view of most courts, the line is crossed where "expert testimony [] *either directly or indirectly* renders an opinion on the credibility or truthfulness of a witness." *Id.* (emphasis added). The court concluded the opinions of the principal and investigator were "the same as directly opining on the truthfulness of the complaining witness." *Id.*

The parties agree Casey made no direct comments on the child's credibility. They disagree on whether she made indirect comments on the child's credibility. As the State points out, this is a nuanced issue that requires a close examination of post-*Myers* precedent.

Shortly after *Myers*, the Iowa Supreme Court decided *State v. Brotherton*, 384 N.W.2d 375, 377 (Iowa 1986), an appeal of a judgment and sentence for second-degree sexual abuse. Brotherton contended the district court abused its

discretion in admitting a counselor's opinion that a three or four-year-old child could not fantasize sexual activity between the child and another person. The court concluded the opinion was inadmissible because the counselor "indirectly opined on the truthfulness of the complaining witness rather than explained relevant mental and psychological symptoms present in a sexually abused child." *Brotherton*, 384 N.W.2d at 379. The court nonetheless found the admission of the testimony harmless because "although inadmissible, [it] was merely cumulative to previous testimony in the record concerning the believability of children's reports of sexual abuse." *Id.*

We agree with the State that *Brotherton* provides a classic example of an impermissible indirect comment concerning a complaining witness's credibility. Subsequent opinions fall closer to the "fine line."

In *State v. Gettier*, 438 N.W.2d 1, 4 (Iowa 1989), an appeal of a conviction for third-degree sexual abuse, an expert testified to "the classic characteristics that are exhibited after people have experienced a trauma." The court noted the testimony "was framed in a general context, equally applicable to any major trauma such as natural disasters, combat/wartime encounters, muggings or sexual assault." *Gettier*, 438 N.W.2d at 4. The court also explained that "[w]hile [the expert's] testimony centered around a particular aspect of this syndrome, commonly described as 'rape trauma syndrome,' this term was not specifically referred to in the trial." *Id.* The court concluded:

> The testimony in the present case showed only the typical symptoms exhibited by a person after being traumatized. Independent evidence showed that the complainant had experienced some of the symptoms of PTSD. Consequently, the evidence was relevant as tending to show that she had been

> traumatized. We see little, if any, prejudicial effect in the admission of this testimony. The more prejudicial term rape trauma syndrome was not used. We do not believe the evidence misleads the jury. In fact, there is little, if any, in the testimony which is not within the jury's own common sense evaluation.

*Id.* at 6.

*Gettier* is instructive because the testimony was along the same lines as Casey's testimony. The testimony was deemed permissible because it was general in nature.

The Iowa Supreme Court reaffirmed this distinction in *State v. Payton*, 481 N.W.2d 325, 327 (Iowa 1992). There, a therapist explained why child sex abuse victims delay reporting abuse. *Payton*, 481 N.W.2d at 327. The therapist did not say anything about the complaining witnesses, a factor that, according to the court, placed her testimony on the right side of the fine line drawn in *Myers*. *See id.*

Shortly thereafter, the court decided *State v. Tracy*, 482 N.W.2d 675, 679 (Iowa 1992). The case involved "prosecutorial maneuvering" to admit otherwise inadmissible evidence. *Tracy*, 482 N.W.2d at 679. In that context, the State called a psychiatrist who "testified, without objection, that there was evidence that K.A. was suffering from child sexual abuse accommodation syndrome." *Id.* at 678. The psychiatrist also testified "that in his opinion, K.A. was telling the truth when she first reported sexual abuse by her stepfather." *Id.* The court stated, "Dr. Comly's testimony regarding child sexual abuse accommodation syndrome and the general truthfulness of child abuse victims was relevant to the prosecution's case only insofar as it tended to discredit K.A.'s testimony. Thus, if K.A. had not testified, [] Dr. Comly's testimony . . . would [not] have been

admissible." *Id.* at 679. In short, the court found the expert's direct comment on the witness's truthfulness as well as the indirect comment on child sexual abuse accommodation syndrome impermissible.

The Iowa Supreme Court next decided *State v. Allen*, 565 N.W.2d 333 (Iowa 1997), an appeal from a conviction for sexual exploitation of an adult by a counselor, which, in the State's view, signaled a retreat from the "indirect" language of *Myers*. Two experts who treated the complaining witness for mental illness arising from sexual and mental abuse as a child testified about the low potential for false memories during hypnotherapy and the absence of a connection between mental illness and credibility. *Allen*, 565 N.W.2d at 338. The court concluded the experts "did not directly evaluate [the complaining witness's] credibility" but "gave their opinions concerning the effects of her mental condition on her ability to tell the truth." *Id.* The court stated the testimony "was permissible to help the jury understand the evidence it heard about [the complaining witness's] mental illness." *Id.*

We believe an expert opinion "concerning the effects of [a complaining witness's] mental condition on her ability to tell the truth" could be seen as an evaluation of the complaining witness's credibility. Be that as it may, we are not persuaded by the State's assertion that *Allen* retreated from the "indirect" language of *Myers*. We believe the court simply had no reason to address indirect comments because the comments made by the experts were direct.

The question of whether an expert opinion amounted to an indirect comment on witness credibility was again addressed in *State v. Seevanhsa*, 495 N.W.2d 354 (Iowa Ct. App. 1992), an opinion on which the State heavily relies.

Seevanhsa argued the district court improperly elicited testimony from a child protective center coordinator regarding child sexual abuse accommodation syndrome (CSAAS). *Seevanhsa*, 495 N.W.2d at 355. The court stated, "[E]xpert testimony regarding CSAAS may, in some instances, assist the trier of fact to both understand the evidence and to determine facts in issue." *Id.* at 357. The court found the testimony admissible because the "expert limited her discussion of CSAAS to generalities. She did not testify she believed the complainant was credible nor did she testify that she believed the complainant had been sexually abused. She limited her discussion to an explanation of the symptoms common to children who have been sexually abused." *Id.* at 357.

The court reached the opposite conclusion in *State v. Pansegrau*, 524 N.W.2d 207 (Iowa Ct. App. 1994), an appeal from a conviction for third-degree sexual abuse of an adult. There, the State called a rebuttal witness, who testified to "sexual abuse trauma" and opined that a hypothetical woman with the same characteristics as the complaining witness suffered sexual trauma and could be expected to delay reporting the sexual abuse incident. *Pansegrau*, 524 N.W.2d at 210. The court stated, "The evidence was not of a general symptom. The hypothetical question outlined all the events the alleged victim had testified preceded the alleged rape. This personalized the opinion and conclusion [and went] beyond the careful exception carved in *Gettier*." *Id.* at 211. The court concluded the "testimony exceeded the permissible limits" and reversed and remanded for a new trial. *Id.*

In a third opinion decided by this court, *State v. Tonn*, 441 N.W.2d 403, 404-05 (Iowa Ct. App. 1989), a clinical psychologist testified to general as well as

specific behaviors. Deciding the case under an ineffective-assistance-of-counsel rubric, the court concluded the testimony was not "necessarily inadmissible." *Tonn*, 441 N.W.2d at 405. The court reasoned that "the opinion evidence could help the jury in understanding the evidence because it explained the delayed reporting symptom that existed in children who were sexually abused." *Id.* The court cited a Washington opinion approving the admission of "statistics that supported [the expert's] opinion that delay in reporting is not unusual and that the length of delay correlates with the relationship between the abuser and child." *Id.* (citing *State v. Petrich*, 683 P.2d 173, 180 (Wash 1984) (overruled on other grounds by *State v. Kitchen*, 756 P.2d 105 (Wash. 1988))). However, the Washington court also concluded that, on retrial "expert testimony should be excluded that invites the jury to conclude that because of defendant's particular relationship to the victim, he is statistically more likely to have committed the crime." *Petrich*, 683 P.2d at 180. It is unclear to what extent the ineffective-assistance-of-counsel standard affected the outcome in *Tonn*.

The pattern we discern in the post-*Brotherton* opinions involving indirect comments in sex abuse cases—*Gettier*, *Payton*, *Tracy*, *Seevanhsa*, *Pansegrau*—is that it is permissible to offer general expert testimony about symptoms or characteristics of sex abuse, but the "fine line" is crossed when that general testimony is tied to the specifics characteristics of the complaining witness. At that point, the testimony becomes an impermissible comment on witness credibility.

Casey's testimony crossed the "fine line." While Casey could permissibly testify to her diagnoses of the child, and, under *Myers*, could testify to the classic

manifestations and symptoms of the diagnosed conditions (posttraumatic stress syndrome and anxiety disorder), her testimony went much further. She described the physical manifestations of sexual abuse, focusing almost exclusively on the manifestations the child's mother observed in this child. She went on to opine that the child's manifestations were consistent with sexual abuse. If the operative distinction between permissible and impermissible testimony is the specificity with which the expert ties the general characteristics of the disorder to the complaining witness, there is no question in our minds that Casey's testimony was impermissible.

We recognize that the Iowa Supreme Court has approved expert testimony on key elements of the State's case. *See State v. Meyers*, 799 N.W.2d 132, 146 (Iowa 2011) (citing expert testimony on ability of child to consent to sex act and giving weight to district court's credibility finding in favor of that testimony). But testimony on an element is not the same thing as testimony about witness veracity or the guilt or innocence of the defendant. *See State v. Hulbert*, 481 N.W.2d 329, 332 (Iowa 1992) (stating expert psychological evidence may not be used to merely bolster witness credibility or be employed as a direct comment on guilt or innocence of the defendant)[1]; *see also State v. Chancy*, 391 N.W.2d 231, 234 (Iowa 1986) (approving testimony of complaining witness's mental condition and specifically noting the case was not controlled by *Myers* because *Myers* involved "a direct comment by an expert on the credibility of a witness" and the testimony in *Myers* was not directed at a fact in issue). Casey

---

[1] *Hulbert* prohibits direct comments on a defendant's guilt, but, as noted, *Myers* is broader, at least with respect to comments on witness veracity.

commented on both, albeit indirectly. By stating that the child's physical appearance was "consistent with sexual abuse," Casey impermissibly reinforced the child's version of events, obliquely commented on Dudley's guilt, and usurped the jury's role in deciding whether Dudley committed sexual abuse. For these reasons, Casey's opinion that the child's physical manifestations were consistent with sex abuse should have been excluded.[2]

We turn to the question of whether Dudley was prejudiced by Casey's testimony. Casey's opinion was not duplicative of duly-admitted testimony. *See Brotherton*, 384 N.W.2d at 379. Her reference to "sex abuse trauma" is a hair's breadth away from the "rape trauma syndrome" and "child abuse accommodation syndrome" references condemned in *Gettier* and *Tracy*. Finally, the fact that Casey was the complaining witness's treating counselor added gravitas to her opinion. We conclude her comments prejudiced Dudley. Accordingly, we reverse and remand for a new trial.

We find it unnecessary to address the remaining issues raised by Dudley.[3]

**REVERSED AND REMANDED.**

---

[2] This court recently decided several opinions on this issue. *See State v. Brown*, No. 12-1633, 2013 WL 5743652, at *5 (Iowa Ct. App. Oct. 23, 2013) (reversing where expert testimony crossed the "fine line" into the realm of an opinion on the credibility of the victim); *State v. McEndree*, No. 12-0983, 2013 WL 3458217, at *5-7 (Iowa Ct. App. July 10, 2013) (concluding court did not abuse discretion in admitting expert testimony to explain generally delayed reporting in children who were sexually abused and in excluding proposed testimony that indirectly rendered an opinion on the credibility or truthfulness of a witness).

[3] We question the State's reliance on the excited utterance exception to the hearsay rule for admission of the neighbor's narration of what the child told her. In light of our reversal on another ground, we need not address this issue.