# IN THE COURT OF APPEALS OF IOWA

No. 20-1375
Filed October 6, 2021

**R.M.,**
        Petitioner-Appellee,

**vs.**

**D.S.,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Buchanan County, Linnea M.N. Nicol, District Associate Judge.

        D.S. appeals the imposition of a protective order under Iowa Code chapter 236A (2020). **AFFIRMED.**

        Nina Forcier of Forcier Law Office, PLLC, Waterloo, for appellant.

        Sonci Kingery of Iowa Coalition Against Sexual Assault, Des Moines, for appellee.

        Heard by Tabor, P.J., and Greer, and Badding, JJ.

**TABOR, Presiding Judge,**

Teenager D.S. appeals the imposition of a protective order for relief from sexual abuse under Iowa Code chapter 236A (2020). H.M., the teenage protected person, did not testify at the hearing. So D.S. argues the evidence provided by H.M.'s mother, R.M., and a nurse practitioner was hearsay and improper vouching. D.S. also argues the juvenile court admitted a Snapchat message without proper foundation. And he argues petitioner R.M. did not present enough evidence to justify the protective order.

We find the court properly admitted the nurse practitioner's testimony and the Snapchat exhibit. And with that proof, R.M. satisfied the preponderance-of-the-evidence standard for obtaining a protective order. So we affirm.

## I. Facts and Prior Proceedings

On August 4, 2020, R.M. filed a chapter 236A petition for relief from sexual abuse against D.S. on behalf of her minor daughter H.M. According to the petition, D.S. "forced" H.M. "to have sexual intercourse" at his home around 12:30 a.m. the day before. The petition alleged H.M. "asked him to stop, tried to push him off and was not able to." R.M. took her daughter to the emergency room later that morning, where medical staff referred them to a child protective services (CPC) clinic. There, a nurse practitioner examined and treated H.M.

Under chapter 236A, the court must hold a hearing "[n]ot less than five and not more than fifteen days after" the petition is filed.[1] Iowa Code § 236A.6(1). The

---

[1] The court also may enter a temporary order before the hearing "upon good cause shown in an ex parte proceeding." Iowa Code § 236A.6(2). Here, the court entered a temporary protective order on August 4, the day the petition was filed.

juvenile court set a hearing for August 10.[2] The court then continued the hearing until August 17 at D.S.'s request. Self-represented R.M. moved to continue the hearing beyond that date, stating counsel was not available to her and she needed more time to "gather medical documentation and witness statements." But citing the statutory time constraint, the court denied R.M.'s motion.

At the hearing, R.M. appeared on her own. She explained H.M. would not be testifying, based on medical advice concerning her physical and mental health. R.M. planned to testify and offer several unsworn statements from others. The court explained it could not accept those hearsay statements and reminded R.M. that she had the burden of proof. R.M. confessed, "I'll be honest. I don't know what I'm allowed to present and not present based on what you just kind of mentioned with having any kind of statements. I can't use them if they can't be spoken to or cross-referenced. I'm not sure what I'm allowed to present."

The court responded, "Well, I'm going to let you present—because you're a pro se person, I'm going to let you present whatever you want to present." But the court gave this warning:

> [T]he rules of evidence do apply. I don't know if you have witnesses, but because you don't know the difference between direct evidence and hearsay, I'm going to let you say whatever you want to say. But what I can tell you is that if everything you have to say is hearsay, that's not going to get us to a preponderance of the evidence.

The court clarified it would rule later whether R.M.'s evidence was admissible.

---

[2] Because of D.S.'s age, the district court waived the case to juvenile court. *See* Iowa Code § 236A.3(4) ("If the person against whom relief from sexual abuse is being sought is seventeen years of age or younger, the district court shall waive its jurisdiction over the action to the juvenile court.").

R.M. then testified to events outside her personal knowledge that were conveyed to her by others, including her husband and H.M. She also testified about the existence of a medical report following the sexual abuse but did not want to offer it into evidence because of an ongoing criminal investigation. D.S. objected at several points that R.M.'s evidence was hearsay. The court "noted" these objections but did not give an immediate ruling. At the close of R.M.'s testimony, the court explained that it could not consider R.M's hearsay testimony.[3] The court then recessed to give R.M. time to subpoena a witness. R.M. was able to subpoena the nurse practitioner who examined H.M.

Appearing by telephone, nurse practitioner Elizabeth Heying recounted what H.M. told her about the assault and her medical condition afterward. D.S. objected on hearsay grounds, but the court allowed it under Iowa Rule of Evidence 5.803(4), the exception for statements made for the purpose of medical diagnosis and treatment.[4] During Heying's testimony, the mother asked whether bruises on H.M. were consistent with H.M.'s report that she was forced into the sex acts. D.S. objected that Heying's affirmative response was impermissible vouching for H.M.'s truthfulness. The court sustained that objection. When Heying testified H.M. identified her assailant as D.S., counsel for D.S. did not object.

---

[3] While the court was not explicit in sustaining D.S.'s hearsay objections, it discussed the out-of-court statements that R.M. wished to offer: "So because they are hearsay and there's no one here to testify, I don't have any—I don't have a lot of options here."

[4] Counsel for D.S. argued H.M's statements about the events leading up to the assault were "not relevant to medical treatment." The court then allowed the nurse to testify: "I need to know where this happened and I need to know who did this so that I can determine treatment and make sure she's safe."

After Heying testified, R.M had one final piece of evidence.  She offered a printout of a photograph she took with her phone of an incoming message to H.M.'s phone on the social media application Snapchat.  The message came from an account labeled with D.S.'s first name and read, "So why u telling people I forced u too?"  The time on H.M.'s phone read "7:31."  R.M. testified: "[H.M.] was in the hospital when this message came through.  I had taken her phone so that she couldn't talk to anyone."

D.S. objected that R.M. had not laid an appropriate foundation for the photograph establishing who sent the message or the date it was sent.  After additional testimony and a second photographic exhibit from R.M., the court admitted the electronic evidence.

D.S. presented no evidence.  Based on Heying's account, the court found R.M. met her burden and issued a protective order: "[T]he petitioner provided evidence, through the testimony of Elisabeth Heying, nurse practitioner that a sexual assault occurred between H.M., who is a fourteen-year-old child, and the respondent, who is a sixteen-year-old child, against the will of H.M.  This conduct constitutes sexual abuse under Iowa Code section 709.4(1)(a)."  D.S. appeals.

## II.  Scope and Standards of Review[5]

D.S. and R.M. debate the applicable standard of review.  Our supreme court has not interpreted chapter 236A.  So we have analogized it to the provisions for

---

[5] "Scope of review" and "standard of review" are often used interchangeably.  But the two terms carry distinct meanings.  "Scope of review" means the range of district court actions (or "what") an appellate court is permitted to examine.  *See* B. John Burns, Theory of Appellate Practice, 4A Ia. Prac., Criminal Procedure § 32:1 (2021 ed.).  By contrast, "standard of review" refers to our level of deference (or "how") we conduct that examination.  *Id.*

relief from domestic abuse under chapter 236. *See, e g.*, *R.W. v. L.W.*, No. 20-0872, 2021 WL 2137684, at *3 (Iowa Ct. App. May 26, 2021); *A.N. v. J.G.*, No. 19-0634, 2020 WL 2061881, at *2 (Iowa Ct. App. Apr. 29, 2020). In interpreting chapter 236, the supreme court has held appellate review depends on the mode of trial. *See Bacon v. Bacon*, 567 N.W.2d 414, 417 (Iowa 1997) (citing *Knight v. Knight*, 525 N.W.2d 841, 843 (Iowa 1994)). In deciding chapter 236A cases, we have found that when the court ruled on evidentiary objections as they were made, it heard the case at law rather than in equity. *See, e.g.*, *A.N.*, 2020 WL 2061881, at *2; *compare R.W.*, 2021 WL 2137684, at *3 (finding court tried case in equity and reviewing de novo, noting "[t]he question of which standard of review to apply requires we visit the trial transcript").

In considering R.M.'s petition, the court reserved some objections to decide later but ruled on others as counsel lodged them. Despite this hybrid approach, we conclude the court tried the case at law, so we review for correction of errors at law. Under this standard, the court's findings are binding upon us if they are supported by substantial evidence. *See Bacon*, 567 N.W.2d at 417. Evidence is substantial if "a reasonable person would find it sufficient to reach a given conclusion." *Mitchell v. Cedar Rapids Cmty. Sch. Dist.*, 832 N.W.2d 689, 703 (Iowa 2013).

In addition, we review most evidentiary rulings for an abuse of discretion. *State v. Fontenot*, 958 N.W.2d 549, 555 (Iowa 2021). But we review hearsay rulings for errors at law. *Id.*

## III. Analysis

We will address the evidentiary issues first, then proceed to the question whether substantial evidence supports granting the protective order.

### A. Evidentiary Rulings

#### 1. R.M.'s testimony

D.S. reprises evidentiary objections on appeal that he won at trial. To start, he contends R.M.'s testimony about what happened to her daughter constituted inadmissible hearsay. Hearsay is "a statement that . . . [t]he declarant does not make while testifying at the current trial or hearing . . . offer[ed] into evidence to prove the truth of the matter asserted." Iowa R. Evid. 5.801(a). At the end of R.M.'s testimony, the court told her it could not consider her hearsay statements. In its written order, the court reiterated that ruling: "the court . . . advised [R.M.] that all the information she provided up to that point was hearsay that would have to be excluded under the Rules of Evidence."

In his appellant's brief, D.S. acknowledges the court found the statements were hearsay. But he argues

> these rulings were not made on the record by the Court at the time of the hearing, the objections were only noted, and the Court did not specifically state in its final ruling that it disregarded the testimony of R.M. so it is unclear whether the Court actually dismissed it as inadmissible hearsay or whether the Court took it into consideration in making its ruling.

It is true the court only "noted" D.S.'s hearsay objections as he made them. But it is a routine practice in bench trials to reserve ruling on objections until later. *See In re Det. of Tripp*, 915 N.W.2d 867, 879 (Iowa 2018) (Mansfield, J., concurring in

part and dissenting in part). The court disregarded R.M's hearsay testimony when granting the protective order. We find no error.

## 2. Nurse practitioner's testimony

Next, D.S. contends the court improperly allowed Heying to relay H.M's statements over his objections to hearsay and impermissible vouching.

### a. Hearsay

Heying is a nurse practitioner with training in sexual assault exams. She works at the CPC and met H.M. there. Heying first spoke with H.M., then conducted a physical exam and "gather[ed] forensic evidence." Afterward, H.M. met with a "forensic interviewer" who did not testify.

Heying explained what kind of information she gathered from H.M.[6] She asked about H.M.'s "medical history" and "obtain[ed] her vital signs." Heying also asked about "school, family, home life information" and "about why she's being seen today." Heying outlined her physical findings for the court. She then recounted what H.M. told her about the assault and the circumstances leading up to it. D.S. objected on hearsay grounds, asserting: "It's not for medical treatment. This is for law enforcement purposes." The court overruled the objection finding the evidence fell within the exception for statements made for the purpose of medical diagnosis or treatment. *See* Iowa R. Evid. 5.803(4).

Under that exception, a statement is admissible if it is "made for—and is reasonably pertinent to—medical diagnosis or treatment; and . . . [d]escribes

---

[6] Heying testified the information she elicited was "important for the medical because it's a holistic exam," which she did not define. Neither party asked what was meant by a "holistic exam." But based on context, it is reasonable to believe she was seeking information on H.M.'s physical and mental health and safety.

medical history, past or present symptoms or sensations, or the inception or general cause of symptoms or sensations." Iowa R. Evid. 5.803(4)(A)–(B). Typically such statements are reliable because a patient has motive to be truthful when offering information to medical professionals. *See State v. Smith*, 876 N.W.2d 180, 185 (Iowa 2016).

To apply this exception, two factors must be true. First, "the declarant's motive in making the statement must be consistent with the purposes of promoting treatment." *State v. Hildreth*, 582 N.W.2d 167, 170 (Iowa 1998) (quoting *State v. Tracy*, 482 N.W.2d 675, 681 (Iowa 1992)). Second, the content of the statements must be "such as is reasonably relied upon in treatment or diagnosis." *Id.* According to D.S., the tension lies in whether H.M made her statements for medical diagnosis and treatment or for law enforcement investigatory purposes.

Heying testified her purpose in asking H.M. for details about the assault was "for me medically to know what I need to look at." She also explained that she needed to know "where this happened" and "who did this" to gauge H.M's safety. Beyond her physical exam, H.M. told Heying what happened the previous night: she snuck out of her house around 11:45 p.m. to "meet a guy." He drove her to his house. Heying narrated H.M.'s statements:

> We were laying down. . . . I was high at the time, but I still remember it. He then started touching and stuff, and I didn't, like, show it back. And then we started having sex. It hurt so bad. I wanted to take a break or something and he wouldn't. He kept going. Kept moving me around. I tried pushing him away a little. He held my hands back a little so I couldn't move them. Put me on my stomach, laid there for a little bit, tried to put it in my butt. I told him to stop. Tried it again. He kind of pushed my head. I finally took a break because he let me. I was laying down, and he took my pants off again after I put them on.

Heying asked H.M. to clarify "sex," and she said, "His penis in my vagina." In addition to pain, H.M. had vaginal bleeding later that morning.

H.M. also identified D.S. by name, and Heying conveyed that name in court. After the alleged assault, H.M. told D.S. she thought she was going to get caught, His reply? "[I]f you get caught, don't bring my name up or say that I raped you."

Heying described H.M.'s physical injuries including bruising "at the three o'clock and nine o'clock position on the hymen, as well as redness noted on the six o'clock position on the hymen." She also noted bruising on H.M.'s left breast and lacerations on her left forearm.

We first address H.M.'s motivation for making these statements and whether it was consistent with promoting her treatment. Of note, R.M. first brought H.M. to the emergency room before being referred to the CPC.[7] This sequence shows the purpose was to obtain medical help for H.M.—if R.M. and H.M. had wanted to spur a criminal investigation, they would have gone to a police station. While in Heying's care, H.M. answered questions about the circumstances of the assault so that the nurse practitioner could assess her safety, as well as her physical and emotional well-being. Thus H.M.'s motivation was consistent with furthering her diagnosis and treatment.

Our supreme court has affirmed that a doctor may testify to the circumstances surrounding the sexual assault of a patient, gathered as part of an

---

[7] D.S. contends H.M. did not need urgent medical care when H.M. went from the emergency room to the CPC. But the hearsay exception does not require that the declarant need urgent care. We rely on the declarant's motive to be truthful because not being truthful would result in misdiagnosis. *See Smith*, 876 N.W.2d at 185. That motive remained when R.M. took H.M. to the CPC.

exam aimed at diagnosis and treatment. *State v. Mann*, 512 N.W.2d 528, 535–36 (Iowa 1994) (citing *State v. Pilcher,* 158 N.W.2d 631 (Iowa 1968), allowing physician who treated rape victim to repeat details of assault). By contrast, D.S.'s reliance on *State v. Long* is misplaced. 628 N.W.2d 440, 447 (Iowa 2001). In *Long*, the court found a domestic-abuse victim's statements about the defendant's mental-health status were inadmissible because they were not "primarily motivated to obtain effective diagnoses and treatment" for the defendant, her husband. *Id.* Rather, the court found "she seemed intent on seeing him kept in some type of confinement facility—a mental hospital or jail." *Id.*

Next we consider whether H.M's statements were of the type reasonably relied on for diagnosis and treatment. They were. H.M. described physical pain from the assault, which D.S. continued over her protests. She described unwanted contact between his penis and her vagina and anus. She described D.S. using force. She also reported vaginal bleeding. These statements described potential sources of injury to H.M.'s body. And Heying's view of H.M.'s physical injuries broadly matched the girl's description of the assault.[8]

We recognize Heying's exam had investigatory purposes as well. For one thing, Heying collected vaginal, anal, and buccal samples for an Iowa Division of Criminal Investigation kit. But the purpose of the nurse practitioner's interview and physical examination was not primarily to launch a law enforcement matter. *Cf. State v. Bentley*, 739 N.W.2d 296, 302 (Iowa 2007) (finding in a confrontation

---

[8] D.S. faults Heying for not testifying about what treatment she recommended to H.M. after her exam. But that information is not required to show the nurse practioner could reasonably rely on H.M.'s statements for diagnosis or treatment.

clause case, "significant purpose" of CPC team approach was to "advance the treatment" of child victim). Heying intended to determine what injuries, both physical and psychological, H.M. suffered and address whether she was safe in her environment. Both are legitimate medical purposes. *See State v. Walker*, 935 N.W.2d 874, 880 (Iowa 2019) ("In the case of sexual abuse, the victim may suffer from and seek treatment for 'emotional and psychological injuries' in addition to physical injuries caused by the abuse." (Citation omitted)). Another important factor is that H.M. met with a forensic interviewer *after* she saw Heying, reinforcing that there were two different purposes for those meetings.

Having found H.M.'s description of the assault to the nurse practitioner fit the hearsay exception under rule 5.803(4), we turn to the focus of D.S.'s argument on appeal—that Heying should not have been allowed to testify that H.M. named D.S. as her abuser. He now contends: "Normally, the identity of the perpetrator of physical injuries is not understood to be necessary information for effective medical treatment." *See Smith*, 876 N.W.2d at 186. As to the testimony identifying D.S. as the assailant, the court recounted:

> The nurse testified that she needed to know who the child had sexual contact with so that she could protect her if it was a household member and so that she could gather information in case there was a potential for sexually-transmitted diseases or pregnancy. The Court found there was a medical reason for the nurse to inquire regarding who had the sexual contact with the child.

D.S. points out Heying did not mention sexually-transmitted diseases or pregnancy as reasons for needing to know who committed the assault. And he claims the court allowed the testimony over his objection. Trouble is, he does not pinpoint where in the record where he objected to Heying's testimony that H.M. named D.S.

as her abuser. *See* Iowa R. App. P. 6.903(2)(g)(1) (requiring appellant's brief to include "a statement addressing how the issue was preserved for appellate review, with references to the places in the record where the issue was raised and decided"). While D.S. lodged a general objection to Heying's testimony about the assault, he did not make a more a specific objection when the subject of his identity came up. We recognize a party need not object repeatedly to the same class of evidence. *State v. Dessinger*, 958 N.W.2d 590, 598 (Iowa 2021). But a general objection to the entirety of a witness's testimony does not preserve error on a more particular ground. *See, e.g.*, *Ruby v. Easton*, 207 N.W.2d 10, 20 (Iowa 1973) (finding, where general hearsay objection was erroneously overruled, a more specific hearsay objection was not preserved); *see also Farrar v. Glynn-Brunswick Mem'l Hosp. Auth.*, 146 S.E.2d 111, 113 (Ga. Ct. App. 1965). So the issue is not preserved for our review. *See State v. Farni*, 325 N.W.2d 107, 109 (Iowa 1982) ("Objections to evidence must be sufficiently specific to inform the trial court of the basis for objecting.").

Even if D.S. had preserved the issue, we would find the hearsay exception applied. True, no categorical rule allows admission of the perpetrator's identity through a medical provider's testimony in all child-abuse cases. *Walker*, 935 N.W.2d at 879. But identifying the perpetrator can be a fair subject for determining the physical and mental-health status and wellbeing of a minor patient.[9] *See id.* at

---

[9] In *State v. Tracy*, our supreme court held that information that the abuser is a member of a child-victim's household is "reasonably pertinent" to a course of treatment which includes removing the child from that home. 482 N.W.2d 675, 681–82 (Iowa 1992) (citing *United States v. Renville*, 779 F.2d 430 (8th Cir. 1985)). D.S. argues that rationale does not apply when the case involves two teenagers.

879 ("In cases of child sexual abuse, ascertaining the identity of the abuser is important for medical purposes because the child's age prevents her from implementing self-care and because parents are often ill-equipped to elicit the abuser's identity."). D.S. is correct that Heying did not mention sexually-transmitted diseases or pregnancy in her testimony. But the nurse practitioner did testify she needed to know who committed the assault to determine treatment and ensure H.M.'s safety. Given Heying's holistic approach, we find H.M.'s statements disclosing the identity of the abuser were admissible.

### b. Vouching

D.S. contends the court allowed Heying to give inadmissible testimony vouching for H.M.'s veracity. Expert witnesses are prohibited from "commenting on the credibility of a victim in a criminal sex abuse proceeding." *State v. Dudley*, 856 N.W.2d 668, 676 (Iowa 2014). So, allowing the expert to testify that the victim's "physical manifestations or symptoms are consistent with sexual abuse trauma . . . allows the expert witness to indirectly vouch that the victim was telling the truth." *Id.* at 677. It constitutes an abuse of discretion when a court allows such testimony. *Id.*

After the nurse practitioner discussed H.M.'s account and described her physical exam results, R.M. asked whether Heying "found physical evidence of force." Heying responded, "I can say that with the history that [H.M.] provided it is consistent." D.S. objected to vouching, and the court sustained the objection. When D.S. asked for the testimony to be stricken from the record, the court said it

---

But learning the identity of the perpetrator may be pertinent for treatment reasons beyond the concern for repeated abuse in the household.

would not consider it. On appeal, D.S. acknowledges that ruling but complains "the testimony was still admitted and heard." Nothing in the ruling references the vouching testimony. The court did not abuse its discretion.

### 3. Misstatement of the law

D.S. next complains the court gave an erroneous legal "instruction" to the parties. During R.M.'s ultimately excluded testimony, the court lamented that local law enforcement did not "handle these things more rapidly" so a criminal no-contact order might be available. The court then stated, "Because the fact is if a sex act occurred between a sixteen-year-old and a fourteen-year-old, that's a crime whether it was consensual or not."[10]

Later, Heying testified the bruising she saw was consistent with a forceful sex act. D.S. objected—though the basis of the objection was not stated and the court never ruled. Instead, the court interjected, "Force is not a requirement in this setting." The court then had this conversation:

> R.M.: Okay. I mean, the purpose of this is to show that he is a danger to her, and that is why I'm asking for the protective order.
> THE COURT: All you have to show under the law is that by a preponderance of the evidence a sexual crime was committed.
> R.M.: Okay.
> THE COURT: And so you don't have to show force.
> R.M.: Okay
> THE COURT: His age.
> R.M.: Right.
> THE COURT: Her age
> R.M.: Is a crime.
> THE COURT: A sex act is a crime.

---

[10] The court did misstate the law. *See* Iowa Code § 709.4(1)(b)(3)(d) (2020) (describing one means of committing third-degree sexual abuse as a sex act committed against a person who is fourteen or fifteen years of age and the other person is four or more years older). Instead, R.M. was required to prove that D.S. committed the sex act "by force or against the will" of H.M. *Id.* § 709.4(1)(a).

On appeal, D.S. acknowledges the court did not rule on his objection. But D.S. contends he relied upon the erroneous "instruction" in his arguments. The record does not support that contention. Granted, the court's misstatement of the sexual abuse elements was unfortunate. But it was not a legal instruction and had no discernable impact on D.S.'s ability to defend against R.M's allegations. And the court correctly applied the law when issuing the protective order.

### 4. Snapchat photograph

Next, D.S. argues the juvenile court abused its discretion in admitting R.M.'s photograph of the Snapchat message as it appeared on H.M.'s phone. D.S. maintains R.M. did not lay a proper foundation to authenticate that the message was sent by him. We reverse the court's decision only for "a clear abuse of discretion." *State v. Musser*, 721 N.W.2d 734, 750 (Iowa 2006) (quoting *Sechler v. State*, 340 N.W.2d 759, 764 (Iowa 1983)).

Iowa Rule of Evidence 5.901(a) says, "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." That evidence may include testimony about what the item is. *Id.* To admit social media evidence, particularly where the exhibit is a printout or screenshot, "two levels of authentication may be necessary: (1) authentication of the communication or underlying content that existed originally in digital form and (2) authentication of the physical download or printout of that content." Laurie Kratky Doré, Authentication of electronically stored evidence: E-mails and social media evidence, 7 Iowa Prac., Evid. § 5.901:11; *see also* R. Collin Mangrum, Requirement of Authentication or Identification; General Provision; Illustrations

and Examples; Enumerated, 3 Neb. Prac., § 27-901 (2021 ed.) ("The foundation for snap chat messages sent over social media applications, much like text messaging, 'has two components: (1) whether the text messages were accurately transcribed and (2) who actually sent the text messages.'" (citation omitted)).

R.M. testified she photographed the screen on H.M.'s phone, which R.M. possessed while H.M. was being examined.  R.M. identified the application as Snapchat.  That application shows H.M. received a message from an account using D.S.'s first name; that message asked the recipient why they were "telling people" that the sender used force.  R.M. also offered a photograph showing her own cell phone screen containing the date and time of the photograph, matching her testimony.  Her testimony supports the court's finding that the photograph is what R.M. claims it to be.  *See State v. Simpson*, No. 18-0666, 2020 WL 4812647, at *2 (Iowa Ct. App. Aug. 19, 2020) (noting that authenticating circumstances can include the context of the message).  Any weakness of the exhibit in establishing D.S. was the sender went to its weight and not to its admissibility.[11]  *Id.*  The court did not abuse its discretion in admitting that photo, as well as the photo of R.M.'s phone depicting the date and time the photograph was taken.[12]

---

[11] D.S. contends R.M. is wrong to rely on *Simpson* because it involved a message on Facebook, a different social media platform.  It also involved a screenshot of a public message posted on Facebook rather than a private message sent over Snapchat.  *Simpson*, 2020 WL 4812647, at *2.  We appreciate that social media platforms differ.  But we find the same principles of authentication apply here.
[12] We also note that the juvenile court's rationale for issuing the protective order did not rely on the Snapchat message.

## B. Sufficiency of the Evidence

Finally, D.S. argues R.M. did not offer enough evidence to prove he committed sexual abuse against H.M. To merit relief under chapter 236A, the petitioning person "must prove the allegation of sexual abuse by a preponderance of the evidence." Iowa Code § 236A.6(1). A preponderance of the evidence means "superiority in weight, influence, or force." *Walthart v. Bd. of Dirs. of Edgewood-Colesburg Cmty. Sch. Dist.*, 684 N.W.2d 740, 744 (Iowa 2005) (quoting *Ball v. Marquis*, 92 N.W. 691, 692 (Iowa 1902)). In other words, the allegation must be "more likely true than not true." *Holliday v. Rain & Hail L.L.C.*, 690 N.W.2d 59, 64 (Iowa 2004). This is not a criminal proceeding where guilt must be proven beyond a reasonable doubt. Instead, the preponderance standard is "the lowest degree of proof upon which issues of fact are determined." *State v. Beasley*, 50 N.W. 570, 570 (Iowa 1891).

In relevant part, chapter 236A defines "sexual abuse" as the "commission of a crime defined in chapter 709." Iowa Code § 236A.2(5). The court found D.S.'s conduct constituted sexual abuse in the third degree. "A person commits sexual abuse in the third degree when the person performs a sex act[13] . . . [and] [t]he act is done by force or against the will of another person." *Id.* § 709.4(1)(a).

Counsel for D.S. conceded at oral argument that if we rejected the evidentiary challenges, the record contained substantial evidence to support issuance of the protective order. We agree H.M.'s report of what happened and

---

[13] The code defines "sex act" as "any sexual contact between two or more person by any of the following: 1. Penetration of the penis into the vagina or anus. 2. Contact between . . . the genitalia of one person and the genitalia or anus of another person." *Id.* § 702.17.

how she sustained her injuries would convince a reasonable person that, more likely than not, D.S. committed sexual abuse against her. So R.M. established the need for a protective order. We affirm.

**AFFIRMED.**